**STATE OF WEST VIRGINIA**
**SUPREME COURT OF APPEALS**

*In re* **T.M.**

**No. 21-0782** (Kanawha County 21-JA-329)

**MEMORANDUM DECISION**

Petitioner Father D.M., by counsel Matthew A. Victor, appeals the Circuit Court of Kanawha County's September 22, 2021, order terminating his parental rights to T.M.[1] The West Virginia Department of Health and Human Resources ("DHHR"), by counsel Patrick Morrisey and Mindy M. Parsley, filed a response in support of the circuit court's order. The guardian ad litem, Jennifer N. Taylor, filed a response on the child's behalf in support of the circuit court's order. On appeal, petitioner argues the circuit court erred in adjudicating him as an abusing parent and in terminating his parental rights to the child.

This Court has considered the parties' briefs and the record on appeal. The facts and legal arguments are adequately presented, and the decisional process would not be significantly aided by oral argument. Upon consideration of the standard of review, the briefs, and the record presented, the Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision affirming the circuit court's order is appropriate under Rule 21 of the Rules of Appellate Procedure.

In May of 2021, the DHHR filed an abuse and neglect petition alleging that law enforcement responded to an emergency where a child was reportedly suffering from cardiac arrest. The DHHR alleged that petitioner informed his roommate that then two-month-old T.M. was "stiff and unresponsive," and the roommate contacted 9-1-1. The DHHR alleged that the child was transported to a local hospital for further medical care. According to the petition, medical staff at the hospital reported that the child was exhibiting symptoms consistent with a subdural hematoma. The DHHR alleged that petitioner spoke with law enforcement detectives and informed them that he had been feeding and changing T.M. when she "stiffened" and that he then ran downstairs to alert his roommate. According to the petition, the detectives quickly determined that petitioner's allegations were inaccurate due to the severity of the child's injuries. The DHHR

---

[1]Consistent with our long-standing practice in cases with sensitive facts, we use initials where necessary to protect the identities of those involved in this case. *See In re K.H.*, 235 W. Va. 254, 773 S.E.2d 20 (2015); *Melinda H. v. William R. II*, 230 W. Va. 731, 742 S.E.2d 419 (2013); *State v. Brandon B.*, 218 W. Va. 324, 624 S.E.2d 761 (2005); *State v. Edward Charles L.*, 183 W. Va. 641, 398 S.E.2d 123 (1990).

alleged that petitioner subsequently claimed that the child "moved herself and slid off the bed and hit her head on the nightstand." The DHHR further alleged that medical personnel confirmed it was unlikely that a two-month-old child "would have the mobility to fall off the bed unassisted" in such a manner. According to the petition, the child was transported to another local hospital for more extensive treatment and was examined by a pediatric intensivist and ophthalmologist who determined that the child suffered from shaken baby syndrome and that older blood was found on her brain during surgery, suggesting multiple injuries over a longer period of time.

The DHHR further alleged that petitioner gave a statement to law enforcement in which he admitted that he caused the child's injuries and that he "sh[ook] the [child] out of frustration and that he was attempting to get the child to stop crying." When asked about older blood found on the child's brain, petitioner further admitted that he had shaken the child approximately one week prior to the incident, and that he had shaken the child "twice in the last couple of weeks." According to the petition, medical staff reported that the child suffered from retinal hemorrhages, which are likely to cause the child to lose her eyesight. The DHHR alleged that petitioner was charged for criminal abuse and neglect in connection with the incident. The DHHR also alleged that petitioner failed to provide the child with the necessary food, clothing, supervision, and housing, placing the child at further risk of harm.

The circuit court held an adjudicatory hearing in July of 2021 during which the court admitted the DHHR's summary report, including medical records detailing the child's injuries. Next, a detective testified about his investigation at petitioner's home after receiving a report that a child had been taken to a local hospital. The detective stated that he spoke with petitioner and his roommate. The detective further explained that he received medical reports from the hospital and determined that T.M. suffered from shaken baby syndrome, non-accidental trauma, severe retinal hemorrhages, and that the child had been examined by an ophthalmologist and had received a "pediatric intensive study." The detective stated that he requested petitioner to appear at the local police station one day after the incident. The detective further stated that he informed petitioner of his rights before their conversation. The detective testified that petitioner admitted to injuring the child and that he had "shaken the baby out of frustration because she had been crying for a long time." The detective further testified that he advised petitioner that the child exhibited older injuries, to which petitioner admitted that he had shaken the child a week prior, again out of frustration over the child's crying. The detective noted that during the course of the investigation, petitioner provided multiple conflicting statements—including alleging that the child had gone "stiff" for an unknown reason. The detective explained that petitioner then reported he was attempting to feed the baby when she went "stiff." However, the detective stated that petitioner then reported that the child "hit her head on the headboard of the bed" before rolling off the bed and hitting her head on the nightstand. After these prior explanations, the detective testified that petitioner ultimately admitted that he had shaken the child several times. On cross-examination, the detective confirmed that petitioner gave two statements, one on the day of the incident and then the next day at the police station. The detective explained that petitioner did not appear to be intoxicated or actively using controlled substances at the time of either interview.

Next, a Child Protective Services ("CPS") worker testified that the DHHR filed the instant petition based upon the police investigation and the medical reports of non-accidental trauma to the child. The worker testified that she went to the hospital, spoke with medical staff and the child's

mother, and obtained the child's medical records. The worker explained that she observed the child and noted no obvious signs of outward physical injury but referenced that the child was connected to tubes and a ventilator and her skin tone was "bluish grey." Petitioner presented no evidence at the adjudicatory hearing.

After hearing from the witnesses, the circuit court found "uncontroverted evidence" that the child suffered from shaken baby syndrome and found that the child's injuries were a result of significantly aggravated circumstances. The circuit court further found that the DHHR presented credible evidence that petitioner "knowingly and intentionally shook" the child "at least twice, resulting in internal injuries that required substantial medical care, hospitalization, and [resulted in] blindness." The circuit court also found that petitioner failed to properly supervise and care for the child and failed to provide for the proper care, supervision, health, welfare, or safety of the child. As a result, the court adjudicated petitioner as an abusing and neglecting parent.

Later that month, the DHHR filed an amended petition alleging that the mother demonstrated a failure to protect T.M. According to the amended petition, the mother and petitioner spoke while petitioner was incarcerated at the South Central Regional Jail. The DHHR alleged that the parents expressed their love for one another and spoke about continuing their relationship. The DHHR further alleged that neither parent discussed the child during their telephone calls.

In September of 2021, the circuit court held the final dispositional hearing during which the mother testified that she and petitioner were in a relationship at the time of the incident. The mother stated that she was at work at the time of the incident and admitted that she spoke to petitioner after he was incarcerated. However, the mother denied discussing petitioner's criminal hearing with him and denied that they were affectionate during the call. The mother stated that she asked petitioner why he "treated their child the way that he did." The mother further explained that she did not intend to continue their relationship and that she was angry with petitioner because he injured the child while she was in his care and gave false information to the DHHR and the police.

Next, a CPS worker testified that the DHHR was recommending petitioner's parental rights be terminated "for shaking his child and causing substantial injuries." The worker stated that petitioner was previously adjudicated as an abusing parent, remained incarcerated, had not participated in services, caused injuries under aggravated circumstances, and admitted to shaking the child on more than one occasion. The worker further testified that the DHHR did not recommend an improvement period and opposed post-termination visitation due to the severity of the child's injuries.

Based upon the evidence and testimony presented, the circuit court found that termination of petitioner's parental rights was in the best interests of the child "given the aggravating circumstances in which she was injured." The court further found that petitioner admitted to the severe abuse of the child and that criminal charges were pending for his conduct. Ultimately, the circuit court found that there was no reasonable likelihood that the conditions of neglect and abuse could be substantially corrected in the near future and that termination of petitioner's parental rights was in the best interests of the child. Accordingly, the court denied petitioner's motion for an improvement period, terminated his parental rights, and denied his request for post-termination

visitation. Petitioner now appeals the circuit court's September 22, 2021, order that terminated his parental rights to T.M.[2]

The Court has previously held:

> "Although conclusions of law reached by a circuit court are subject to *de novo* review, when an action, such as an abuse and neglect case, is tried upon the facts without a jury, the circuit court shall make a determination based upon the evidence and shall make findings of fact and conclusions of law as to whether such child is abused or neglected. These findings shall not be set aside by a reviewing court unless clearly erroneous. A finding is clearly erroneous when, although there is evidence to support the finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. However, a reviewing court may not overturn a finding simply because it would have decided the case differently, and it must affirm a finding if the circuit court's account of the evidence is plausible in light of the record viewed in its entirety." Syl. Pt. 1, *In Interest of Tiffany Marie S.*, 196 W.Va. 223, 470 S.E.2d 177 (1996).

Syl. Pt. 1, *In re Cecil T.*, 228 W. Va. 89, 717 S.E.2d 873 (2011).

On appeal, petitioner argues that the circuit court erred in adjudicating him as an abusing parent. Petitioner attacks the allegations against him and argues that they were insufficient to support either adjudication or disposition. He first asserts that no expert medical testimony was introduced to prove the cause and nature of the child's injuries. Furthermore, petitioner argues, for the first time on appeal, that the evidence that he abused the child was hearsay and specifically attacks the testimony from a detective at the adjudicatory hearing. Upon our review, we find petitioner is entitled to no relief on appeal.

In regard to the adjudication of allegations properly alleged in a child abuse and neglect petition, this Court has held that

> "[West Virginia Code § 49-4-601(i)], requires the [DHHR], in a child abuse or neglect case, to prove 'conditions existing at the time of the filing of the petition . . . by clear and convincing [evidence].' The statute, however, does not specify any particular manner or mode of testimony or evidence by which the [DHHR] is obligated to meet this burden." Syllabus Point 1, *In Interest of S.C.*, 168 W.Va. 366, 284 S.E.2d 867 (1981).

Syl. Pt. 1, *In re Joseph A.*, 199 W. Va. 438, 485 S.E.2d 176 (1997) (citations omitted). This Court has explained that "'clear and convincing' is the measure or degree of proof that will produce in the mind of the factfinder a firm belief or conviction as to the allegations sought to be established." *In re F.S.*, 233 W. Va. 538, 546, 759 S.E.2d 769, 777 (2014) (citation omitted). However, "the clear and convincing standard is 'intermediate, being more than a mere preponderance, but not to

---

[2]The child remains with her nonabusing mother and has achieved permanency in her care.

the extent of such certainty as is required beyond a reasonable doubt as in criminal cases.'" *Id.* (citation omitted).

Critically, petitioner did not object to the testimony of the law enforcement detective at the adjudicatory hearing below. This Court has said that

> [w]hen a litigant deems himself or herself aggrieved by what he or she considers to be an important occurrence in the court of a trial or an erroneous ruling by a trial court, he or she ordinarily must object then and there or forfeit any right to complain at a later time. The pedigree for this rule is of ancient vintage, and it is premised on the notion that calling an error to the trial court's attention affords an opportunity to correct the problem before irreparable harm occurs.

*State v. LaRock*, 196 W. Va. 294, 316, 470 S.E.2d 613, 635 (1996). Further, we have also said that

> [t]he West Virginia Rules of Evidence declare that parties must object to the wrongful offer of evidence at a particular time and with reasonable specificity. The failure to object at the time and in the manner designated by Rule 103(a) of the West Virginia Rules of Evidence is treated as a procedural default, with the result that the evidence, even if erroneous, becomes the facts of the case. West Virginia practice imposes the same duty of diligence in regard to nonjury cases. Silence in the circuit court typically constitutes a waiver of objection. *See* W.Va.R.Evid. 103(a)(1).

*In Interest of Tiffany Marie S.*, 196 W. Va. at 234, 470 S.E.2d at 188. Moreover, "'[o]ur general rule is that nonjurisdictional questions . . . raised for the first time on appeal, will not be considered.' *Shaffer v. Acme Limestone Co., Inc.*, 206 W. Va. 333, 349 n. 20, 524 S.E.2d 688, 704 n. 20 (1999)." *Noble v. W.Va. Dep't of Motor Vehicles*, 223 W. Va. 818, 679 S.E.2d 650 (2009). Because petitioner failed to object to this testimony at the time it was offered, he has waived the issue on appeal.

Further, considering the evidence produced at the adjudicatory hearing, we find no error in the circuit court's finding that petitioner physically abused the child. The detective testified that petitioner admitted to shaking the child on multiple occasions, including in connection with the incident resulting in her hospitalization. The CPS worker testified that she went to the hospital, spoke with medical staff, and obtained and reviewed the medical records that documented the full extent of injuries to the child. Petitioner's contention that it was error for the circuit court to adjudicate petitioner "without the benefit of any medical testimony or description," misstates the record. At the adjudicatory hearing, the circuit court admitted the DHHR's court summary, which included medical records detailing the incidents of abuse and the child's injuries. The circuit court found that this was clear and convincing evidence that petitioner had abused the child, and we agree. Further, petitioner did not testify at the adjudicatory hearing.

> Because the purpose of an abuse and neglect proceeding is remedial, where the parent or guardian fails to respond to probative evidence offered against him/her during the course of an abuse and neglect proceeding, a lower court may properly

consider that individual's silence as affirmative evidence of that individual's culpability.

Syl. Pt. 2, *W. Va. Dep't of Health & Human Res. ex rel. Wright v. Doris S.*, 197 W. Va. 489, 475 S.E.2d 865 (1996). Accordingly, we find that the circuit court's findings are supported by the evidence, and, consequently, we find no error in the circuit court's adjudication of petitioner as an abusing parent.

Next, petitioner argues that the circuit court erred in terminating his parental rights. According to petitioner, he should have been granted an improvement period because his "prompt action of seeking medical care for T.M. demonstrated his care" for the child. Petitioner contends that he did not intentionally shake the child but rather engaged in a "protective act of soothing the distressed [c]hild." Finally, petitioner states that services tailored to addressing specific parenting and adult life skills could have been implemented upon petitioner's release from pretrial custody.

Regarding his request for an improvement period, petitioner acknowledges that he was incarcerated at the time he filed his request. As such, it is unclear how petitioner believes that he could have established that he was likely to fully comply with an improvement period at that time. It is also important to note that, on appeal, petitioner continues to minimize his abusive and neglectful conduct by arguing that he did not shake the child, and suggesting that the child "perhaps, hit her head against the bedroom floor or the nightstand." Petitioner previously claimed that is how the child sustained her injuries in initial conversations with law enforcement, before admitting that he shook the child. This argument only underscores petitioner's continued refusal to acknowledge his wrongdoing that gave rise to the petition's filing, which he demonstrated at several points in the proceedings below. This refusal also supports the circuit court's denial of petitioner's request for an improvement period. As the Court has explained,

> [i]n order to remedy the abuse and/or neglect problem, the problem must first be acknowledged. Failure to acknowledge the existence of the problem, i.e., the truth of the basic allegation pertaining to the alleged abuse and neglect or the perpetrator of said abuse and neglect, results in making the problem untreatable and in making an improvement period an exercise in futility at the child's expense.

*In re Timber M.*, 231 W. Va. 44, 55, 743 S.E.2d 352, 363 (2013) (citation omitted). As such, the refusal to acknowledge his wrongful conduct alone was a sufficient basis for denial, and we find no abuse of the circuit court's discretion in denying his motion for an improvement period. *See In re M.M.*, 236 W. Va. 108, 115, 778 S.E.2d 338, 345 (2015) ("West Virginia law allows the circuit court discretion in deciding whether to grant a parent an improvement period.").

Likewise, we find no error in the termination of petitioner's parental rights. West Virginia Code § 49-4-604(c)(6) provides that circuit courts are to terminate a parent's parental rights upon finding that there is "no reasonable likelihood that the conditions of neglect or abuse can be substantially corrected in the near future" and that termination is necessary for the child's welfare. Pursuant to West Virginia Code § 49-4-604(d), "'[n]o reasonable likelihood that conditions of neglect or abuse can be substantially corrected' means that . . . the abusing adult . . . [has]

demonstrated an inadequate capacity to solve the problems of abuse or neglect on their own or with help."

Here, the record clearly shows that then two-month-old T.M. sustained severe and serious injuries over a span of time while in petitioner's care and control. Additionally, petitioner failed to accept any wrongdoing for the child's extensive injuries. Given these issues, it is apparent that "the degree of family stress and the potential for further abuse and neglect are so great as to preclude the use of resources to mitigate or resolve family problems, or assist the abusing parent or parents in fulfilling their responsibilities to the child." *See* W. Va. Code § 49-4-604(d)(5). Accordingly, we find that ample evidence supported the circuit court's finding that there was no reasonable likelihood that the conditions of neglect or abuse can be substantially corrected in the near future.

Finally, while petitioner claims that he should have been granted a less-restrictive dispositional alternative to the termination of his parental rights, we have previously held that

> "[t]ermination of parental rights, the most drastic remedy under the statutory provision covering the disposition of neglected children, [West Virginia Code § 49-4-604] may be employed without the use of intervening less restrictive alternatives when it is found that there is no reasonable likelihood under [West Virginia Code § 49-4-604(d)] that conditions of neglect or abuse can be substantially corrected." Syllabus point 2, *In re R.J.M.*, 164 W.Va. 496, 266 S.E.2d 114 (1980).

Syl. Pt. 5, *In re Kristin Y.*, 227 W. Va. 558, 712 S.E.2d 55 (2011). As there was no reasonable likelihood that petitioner could correct the conditions of abuse and neglect in the near future, he was not entitled to a less-restrictive alternative disposition. Based on the evidence set forth above, we find no error in the circuit court's termination of petitioner's parental rights.

For the foregoing reasons, we find no error in the decision of the circuit court, and its September 22, 2021, order is hereby affirmed.

Affirmed.

**ISSUED**: March 9, 2022

**CONCURRED IN BY**:

Chief Justice John A. Hutchison
Justice Elizabeth D. Walker
Justice Tim Armstead
Justice William R. Wooton
Justice Alan D. Moats sitting by temporary assignment